**Opinion issued February 20, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00198-CR

————————————

**SAMUEL DENNY ROBINSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 976148**

---

## MEMORANDUM OPINION

A jury found Samuel Denny Robinson guilty of murder and assessed his punishment at sixty-five years' confinement. In two appellate issues, Robinson contends that the trial court abused its discretion: (1) by denying his motion to

dismiss the indictment based on speedy trial grounds, and (2) by denying his request to declare a defense witness "unavailable" and admit her testimony from his first trial. We affirm.

**Factual Background**

On January 31, 2004, Jack Harris and his brother Jarvis Harris were standing outside of a convenience store waiting for friends when a man in a bright blue jacket approached Jack.[1] Jack and the man in blue, who Jack referred to as "Bo" and was later identified as Robinson, began to argue. Jarvis, who did not know "Bo," became uncomfortable and unsuccessfully attempted to extract his brother from the situation. According to Jarvis, "Bo" pulled out a pistol, shot Jack once in the head, and then fled the scene. The store's surveillance camera recorded Jack and "Bo" greeting each other but the shooting occurred outside the camera's range.

After Jarvis told Investigator Wayne Wendel that Jack had referred to the shooter as "Bo," Wendel learned that Robinson, who lived in an apartment complex across the street from the convenience store, had previously used the alias "Bo." Wendel constructed a photo array containing Robinson's photo and

---

[1]     For the sake of clarity, Jack and Jarvis Harris will be referred to by their first names.

presented it to Jarvis on February 2, 2004.[2] Jarvis positively identified Robinson from the photo array as the person who shot and killed Jack.

That same day, Robinson was charged with murder based on Jarvis' photo identification. After Robinson was charged, Investigator Wendel unsuccessfully attempted to locate Robinson at his last known address. Deputy Dennis Brown testified that the Harris County Sheriff's Office (HCSO) received Robinson's arrest warrant on May 2, 2004, and entered the warrant into the National Crime Information Center (NCIC). According to Deputy Brown, the HCSO made thirteen subsequent attempts to execute the arrest warrant before Robinson was arrested in Mississippi and transported to the Harris County jail in March 2009 to await trial for Jack's murder. Among other methods, the HCSO searched for a current address for Robinson using multiple databases—such as driver's license inquiries—and on December 27, 2004, the HCSO placed Robinson on their "ten most wanted" list and posted his photograph on their website.

The HCSO also periodically received information from other law enforcement sources regarding Robinson's location. Deputy Brown testified that on May 6, 2004, the HCSO learned that Robinson was also wanted in Amite County, Mississippi regarding a recent shooting, but they did not have any

---

[2] Robinson's brief incorrectly asserts that Jarvis did not identify him from the photo array until February 22, 2004—three weeks after the shooting. The photo array is signed by Jarvis and dated February 2, 2004, and Wendel testified that he presented the photo array to Jarvis on February 2.

additional information regarding Robinson's whereabouts. On July 18, 2005, U.S. Marshall Antonio Pittman informed the HCSO that he had received an anonymous tip indicating that Robinson had been arrested and released in Jackson, Mississippi under the alias "Aurilous Collins," along with a different date of birth.

On March 21, 2006, the U.S. Marshal's Service informed the HCSO that Robinson had been arrested on the Harris County murder warrant and was in custody in Hinds County, Mississippi. That day the HCSO placed a detainer on Robinson with the U.S. Marshal's Service, and on May 3, 2006 they mailed a certified copy of the warrant along with Robinson's identification to Hinds County. Brown testified that once a detainer is placed on a defendant, the HCSO normally waits for that agency to notify them when the defendant is finished with his local charges and ready for pickup.

Hinds County never notified the HCSO that Robinson was ready for pickup, and on February 6, 2009, Amite County, Mississippi informed the HCSO that Robinson had been released and that they were currently looking for him. On February 18, 2009, the HCSO was advised that Robinson was in custody in Hinds County and ready for pickup. The HCSO arranged to get Robinson and he arrived at the Harris County jail on March 2, 2009.

Robinson testified that he left Harris County at his mother's urging after he was acquitted on a felon in possession of a weapon charge in 2003. According to

4

Robinson, he did not know that he was wanted for murder in Harris County until he was arrested in March 2006 in Mississippi. Robinson testified that when he was arrested on the Harris County murder warrant in March 2006, the police found drugs at his residence and he was charged with cocaine possession.

Robinson also testified that although he was arrested under his true name, Hinds County gave him the name "Aurilous Collins" and a new social security number, and told him that he "better answer to it." Robinson testified that he pleaded guilty to the cocaine possession charge on June 7, 2007 and he was sentenced to two years' confinement in the Mississippi Department of Corrections (MDC). According to Robinson, he was given the name "Karmilous Cooper" when he was sent to the MDC. Robinson also testified that he asked MDC officials if he was wanted on the Harris County murder warrant when he was released from prison in December 2007, and they informed him that he was not.

On cross-examination, Robinson acknowledged that he was the person referenced in State's exhibit 1, the MDC "pen packet" admitted by the State without objection. Contrary to Robinson's testimony, the pen packet, which included Robinson's indictment and his time-served report from Hinds County, indicated that Robinson was arrested for the cocaine possession charge on August 15, 2005, released on bond that same day, and not booked again until March 22, 2006. The pen packet also indicates that Robinson was charged under the name

5

"Karmilous Cooper," along with an incorrect date of birth, incorrect social security number, and a notation that he uses the alias "Aurilous Collins." The State also offered certified copies from the FBI Crime Justice Information Services Division documenting the 124 NCIC inquiries made by various agencies looking for Robinson from 2004 to 2009, including inquiries by the HCSO.

**Procedural Background/Motion to Dismiss**

Arrested in Hinds County, Mississippi in February 2009 and subsequently transported to the Harris County jail, Robinson arrived in Harris County on March 2, 2009. His trial was initially scheduled for March 30, 2009. After agreeing to reset his case at least eleven times, Robinson filed a motion to dismiss on June 17, 2010, alleging a violation of his right to a speedy trial under the Sixth Amendment of the United States Constitution, Article I, Section 10 of the Texas Constitution, and Article 28.061 of the Texas Code of Criminal Procedure. After he filed the motion to dismiss, Robinson's case was taken off the trial docket and he agreed to three additional resets of his case before his motion was heard. On November 11, 2010, the trial court heard and denied Robinson's motion to dismiss the indictment based on speedy trial grounds. After two unsuccessful attempts to seat a jury beginning on November 30, 2010, Robinson's first trial commenced on January 28, 2011—twenty-three months after he arrived at the Harris County Jail. During Robinson's first trial, Tracy Bailey testified that Robinson, who had grown up in

6

Mississippi, lived in Harris County between 1999 and 2003. According to Bailey, Robinson moved back to Mississippi in 2003 and lived with his mother for a few months before moving in with Bailey. On February 2, 2011, Robinson's first trial resulted in a hung jury and ended in a mistrial.

Robinson was retried a year later and a jury found him guilty. During Robinson's second trial in February 2012, Robinson's mother and his aunt testified that Bailey had moved to Washington State and neither woman knew how to reach her.

**Right to Speedy Trial**

In his first issue, Robinson contends that the trial court abused its discretion by denying his motion to dismiss the indictment based on speedy trial grounds.

**A. Standard of Review**

We review a trial court's speedy trial decision under a bifurcated standard of review; an abuse of discretion for factual components and a de novo standard for legal components. *Cantu v. State*, 253 S.W.3d 273, 281–82 (Tex. Crim. App. 2008); *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (en banc). In reviewing factual issues, we defer to a trial court's resolution of "disputed facts" and its right to draw "reasonable inferences" from those facts. *Cantu*, 253 S.W.3d at 282. As trier of fact, a trial court is the sole judge of the credibility of the

witnesses, and may disbelieve any evidence so long as there is a reasonable basis for doing so. *Id.*

## B.    Applicable Law

The Sixth Amendment to the United States Constitution and Article one, Section ten, of the Texas Constitution guarantee an accused the right to a speedy trial. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *Cantu*, 253 S.W.3d at 280 & n.16. Whether raised under the federal or state constitution, we analyze speedy trial claims on an ad hoc basis by balancing four factors: (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2191–92 (1972); *Zamorano*, 84 S.W.3d at 648. No single factor is necessary or sufficient to establish a violation. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003); *see also Ex parte Perez*, 398 S.W.3d 206, 217 (Tex. Crim. App. 2013). Rather, courts must "engage in a difficult and sensitive balancing process" that takes into account the parties' overall conduct. *Zamorano*, 84 S.W.3d at 648; *see also Ex parte Perez,* 398 S.W.3d at 217. The factors are related, and we apply them "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Cantu*, 253 S.W.3d at 281. Review of the individual factors

8

necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Id.* at 282.

While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and prejudice. *Id.* at 280. However, the defendant's burden of proving a speedy-trial violation varies inversely with the State's degree of culpability and the length of the delay. *Ex parte Perez*, 398 S.W.3d at 217 (citing *Cantu*, 253 S.W.3d at 280). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Cantu*, 253 S.W.3d at 280–81.

## C.     Length of Delay

The length of delay is the triggering mechanism for an analysis of the remaining three *Barker* factors and is measured from the date the defendant is arrested or formally accused. *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192; *Cantu*, 253 S.W.3d at 280; *see also Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1 (1992) (speedy-trial analysis triggered by "presumptively prejudicial" delay). Depending on the nature of the charges, a post-accusation delay of eight months or more is presumptively prejudicial for purposes of the length-of-delay factor. *Zamorano*, 84 S.W.3d at 649 n.26 (stating delay of eight months or more is "presumptively prejudicial" and will trigger a speedy trial

analysis). Here, Robinson was formally charged with Jack's murder on February 2, 2004. He filed his motion to dismiss based on a speedy trial violation on June 17, 2010. The State concedes, and we agree, that this delay is "presumptively prejudicial" and sufficiently lengthy to trigger a speedy trial analysis under *Barker*.

Once the defendant has crossed the threshold of showing a presumptively prejudicial delay, we must consider the length of the delay beyond the triggering point because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Zamorano*, 84 S.W.3d at 649 (quoting *Doggett*, 505 U.S. at 652, 112 S. Ct. at 2691); *see also Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) (time period that stretches well beyond bare minimum needed to trigger examination of speedy trial claim weighs heavily against State). Here, five years and one month elapsed between the time Robinson was charged with Jack's murder (February 2, 2004) and the time he arrived in Harris County jail to await trial for the murder (March 2, 2009). An additional twenty-three months elapsed before the commencement of Robinson's first murder trial (January 28, 2011) and it was another year before Robinson's second and final murder trial.

After returning to Harris County in March 2009, Robinson agreed to reset his case at least eleven times before he filed his motion to dismiss on speedy trial grounds on June 17, 2010, and he agreed to three additional resets before his motion was heard on November 11, 2010. Robinson also agreed to reset his case

10

at least six more times between his first and second trials. Agreed resets are inconsistent with the assertion of a speedy trial right and the time covered by such agreed resets is properly excluded from any speedy trial computations. *See Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (stating agreed resets inconsistent with assertion of speedy trial right and excluding time covered by agreed resets in computing length of delay); *State v. Kuri*, 846 S.W.2d 459, 463 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (same), *overruled on other grounds by Johnson v. State*, 954 S.W.2d 770 (Tex. Crim. App. 1997) (same). Nevertheless, even after excluding the time covered by agreed resets, the delay in this case still greatly exceeds the minimum period needed to trigger an examination of Robinson's speedy trial claim. As such, the length of the delay in this case weighs against the State and in favor of finding a violation of Robinson's right to a speedy trial.

**D.    Reasons for the Delay**

Upon a finding that a presumptively prejudicial delay has occurred, the State bears the initial burden of justifying the delay. *Cantu*, 253 S.W.3d at 280–81; *Emery v. State*, 881 S.W.2d 702, 708 (Tex. Crim. App. 1994). Different weights are assigned to different reasons for a delay. *Zamorano*, 84 S.W.3d at 649 (citing *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192). For example, a deliberate attempt to delay a trial is weighed heavily against the State, while more neutral reasons such

11

as negligence or overcrowded dockets are also weighed against the State, but less heavily. *Id.* Robinson, who acknowledges that the reason for the delay in this case falls under the second, more neutral category (i.e., negligence on the State's part), argues that the State was negligent based primarily upon the fact that the HCSO failed to take any action to locate and return Robinson to Harris County between March 21, 2006—when Robinson was arrested on the Harris County murder warrant in Mississippi—and February 6, 2009—when Hinds County, Mississippi law enforcement notified the HCSO that Robinson was available for transport. In particular, Robinson argues that, although the State knew that he was in custody in Mississippi in March 2006, the State failed to extradite him until three years later, and instead, waited for Mississippi officials to inform them that Robinson was available for transport to Texas.

The State disputes that it was negligent and contends that its efforts to apprehend Robinson were hindered by the fact that Robinson fled the jurisdiction immediately after the murder, attempted to evade apprehension by residing with friends and relatives in Mississippi and working as a day laborer on a cash-only basis, and used unknown aliases when he was incarcerated on other criminal charges in Mississippi. *See Burgett v. State*, 865 S.W.2d 594, 597 (Tex. App.— Fort Worth 1993, pet. ref'd) (holding that accused cannot sustain speedy trial claim when delay was result of evading apprehension) (citing *Dickey v. Florida*, 398

12

U.S. 30, 48, 90 S. Ct. 1564, 1574 (1970) and *United States v. Smith*, 534 F.2d 74, 75–76 (5th Cir. 1976)).

Here, Robinson testified that he was living in Mississippi at the time of the murder, he did not know that he was wanted for murder until he was arrested in March 2006 on the murder warrant and an unrelated cocaine possession charge, and that although he was arrested under his true name, Hinds County gave him the name "Aurilious Collins" and a new social security number, and told him that he "better answer to it." Robinson also testified that he was given the name "Karmilous Cooper" when he was sent to the MDC.

The indictment and booking information contained in State's exhibit one— Robinson's MDC pen packet—contradicts Robinson's testimony regarding when he was arrested on the cocaine possession charge and when he started using the aliases Aurilous Collins and Karmilous Cooper. Given these discrepancies between Robinson's testimony and the Mississippi pen packet that Robinson acknowledged was his, as sole judge of a witness' credibility, it was reasonable for the jury to disbelieve Robinson's testimony regarding when he relocated to Mississippi and his use of aliases during that same time frame. *Cantu*, 253 S.W.3d at 280. Robinson's testimony that he was living with friends and relatives after he returned to Mississippi and working as a day laborer on a cash-only basis further support the jury's reasonable belief that Robinson was purposefully evading

13

apprehension on the murder charge. Given Robinson's attempts to evade apprehension in Mississippi—including his use of aliases and false birthdates and social security numbers—this factor weighs against Robinson. *See Burgett*, 865 S.W.2d at 597; *see also Dickey*, 398 U.S. at 48, 90 S. Ct. at 1574; *Smith*, 534 F.2d at 75–76.

**E.     Assertion of the Right to a Speedy Trial**

Robinson bears the burden of establishing the third *Barker* factor—i.e., that he asserted his right to a speedy trial. *Cantu*, 253 S.W.3d at 280. When a defendant is unaware of the charge or the warrant, we consider whether and how the defendant asserted his speedy trial right once he became aware. *See Doggett*, 505 U.S. at 653–54; *Barringer*, 399 S.W.3d at 601; *see also Cantu*, 253 S.W.3d at 282–83 ("Whether and how a defendant asserts this right is closely related to the other three factors because the strength of his efforts will be shaped by them."). The "defendant's assertion of his speedy-trial right (or his failure to assert it) is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Cantu*, 253 S.W.3d at 283.

A request that the trial court dismiss the charges based on a speedy trial violation, rather than a request for a prompt trial setting, weakens the strength of a speedy trial claim because it indicates a "desire to have no trial instead of a speedy one." *Id.* "If a defendant fails to first seek a speedy trial before seeking dismissal

14

of the charges, he should provide cogent reasons for this failure." *Id.* "Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Id.*

Here, Robinson testified that he did not know that he was wanted for murder in Harris County until he was arrested in Mississippi in March 2006. Without making a demand for a speedy trial, Robinson filed a motion to dismiss on speedy trial grounds on June 17, 2010, one day before his first trial was set to begin. By this time, Robinson had already agreed to reset his case at least eleven times after he arrived in Harris County in March 2009. *See Celestine*, 356 S.W.3d at 507 (stating agreed resets inconsistent with assertion of speedy trial right). As such, the record reflects that, rather than a speedy trial, Robinson wanted no trial at all. *Cantu*, 253 S.W.3d at 283. Accordingly, this factor weighs against Robinson. *See id.* at 283–84; *Prihoda v. State*, 352 S.W.3d 796, 805 (Tex. App.—San Antonio 2011, pet. ref'd) (concluding filing of motion to dismiss three years after arrest and on first scheduled day of trial weighed heavily against defendant).

### F.    Prejudice to the Defendant Resulting from the Delay

Robinson bears the burden of establishing the fourth *Barker* factor—i.e., that he was prejudiced by the delay. *See Cantu*, 253 S.W.3d at 280. We assess any possible prejudice to the defendant in light of the defendant's interests that the

15

speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the accused's anxiety and concern; and (3) to limit the possibility that the accused's defense will be impaired.[3] *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193; *Cantu*, 253 S.W.3d at 280. Of these factors, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193; *see also Cantu*, 253 S.W.3d at 285; *Dragoo*, 96 S.W.3d at 315. Although the defendant need not show actual prejudice, he has the burden to show that some prejudice was caused by the delay. *State v. Munoz*, 991 S.W.2d 818, 826 (Tex. Crim. App. 1999) (en banc); *Jones*, 168 S.W.3d at 349 (citing *Harris v. State*, 489 S.W.2d 303, 308 (Tex. Crim. App. 1973)). The burden then shifts to the State to show the defendant did not suffer serious prejudice beyond that which would normally result from ordinary delay. *Munoz*, 991 S.W.2d at 826.

### 1. Oppressive Pretrial Incarceration

Here, Robinson argues that his incarceration in Mississippi after he was arrested on the Harris County murder warrant in March 2006 was oppressive because he did not receive time-served credit for the one year and nine months he was confined in Mississippi. Contrary to Robinson's suggestion, he was not

---

[3] Robinson argues that the delay in this case subjected him to oppressive pretrial incarceration and impaired his ability to mount an adequate defense; he does not contend that the delay caused him anxiety and concern.

16

serving time solely on Harris County's warrant while he was incarcerated in Mississippi. Indeed, the record reflects that Robinson was incarcerated in Mississippi on an unrelated cocaine possession charge from March 21, 2006 until December 10, 2007, when he was released on parole. After that time, Robinson was either on parole or free until he was taken into custody on February 18, 2009.[4]

Robinson does not cite to any case law in support of his contention that he should have received time-served credit for the time he was incarcerated in Mississippi on an unrelated charge or that it is appropriate to consider the time he served for his Mississippi conviction for purposes of evaluating whether this pretrial incarceration on the Harris County murder charge was oppressive for speedy-trial analysis purposes. *See generally Wade v. State*, 83 S.W.3d 835, 839 (Tex. App.—Texarkana 2002, no pet.) (declining to weigh time that defendant "was free or was confined for other charges unrelated to the current matters" against State for speedy-trial purposes).

Robinson also argues that the time he spent in Harris County awaiting trial, and then retrial, was oppressive. As previously discussed, Robinson *repeatedly* agreed to reset his case during these periods and he failed to assert his speedy trial right before presenting a motion to dismiss—both of these factors are inconsistent

---

[4]    Robinson concedes that after he was convicted following his second trial, he was credited with time served from the rearrest in Mississippi on February 18, 2009, until the date of the judgment on February 22, 2012.

17

with the assertion of a speedy trial right and weigh against any claim of oppressive pretrial incarceration. *See Shaw*, 117 S.W.3d at 890 (holding that presumption that defendant was prejudiced by delay was negated by defendant's failure to assert his speedy trial right). As such, Robinson failed to demonstrate that the delay subjected him to oppressive pretrial incarceration.

### 2. Impairment of Defense

Robinson further contends that his defense was impaired by the length of the delay because "had he been aware of the charges against him, including the precise time frame of when he was accused of murder, he would have been able to assist in the preparation of his defense." In particular, Robinson claims that "he could have located former co-workers in the landscaping business or otherwise produced documentation proving he was in Mississippi at the time of the offense." Essentially, Robinson argues that the delay prevented him from securing alibi witnesses who would have placed him in Mississippi at the time of the murder.

Where the basis for prejudice is witness unavailability, a defendant must demonstrate that: (1) the witness was unavailable at the time of trial; (2) the witness' testimony would have been relevant and material; and (3) the defendant exercised due diligence in an attempt to locate the witness. *Phipps v. State*, 630 S.W.2d 942, 947 (Tex. Crim. App. 1982); *Ervin v. State*, 125 S.W.3d 542, 548 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Although Robinson testified that

18

it was difficult to contact witnesses on his behalf while he was incarcerated, he does not specifically identify any alibi witnesses who were unavailable at the time of trial (aside from referencing a general category of potential witnesses—other day laborers he had worked with on landscape jobs in Mississippi), nor did he demonstrate that he had actually attempted to contact any such witnesses. As such, Robinson failed to show that the length of the delay prejudiced his ability to prepare his defense because he failed to demonstrate that there were alibi witnesses who were unavailable at the time of trial and that he exercised due diligence in his attempt to locate these potential witnesses. *See generally Phipps*, 630 S.W.2d at 947 (holding defendant fails to show prejudice even if missing witnesses' testimony was material if he does not show diligence in procuring witnesses); *Ervin*, 125 S.W.3d at 548 (weighing defendant's failure to show that he was prejudiced by his wife's death while he was incarcerated against him because he did not demonstrate what she would have testified to, or why it was material).[5]

Robinson also contends that the delay prejudiced his defense because it further cemented in Jarvis's mind "his identification of [Robinson] which occurred three weeks after the shooting and employed the highly suggestive technique of

---

[5] We further note that Robinson *was* able to produce an alibi witness for his first trial—Tracy Bailey—and Bailey's testimony indicated that Robinson's mother—who was present for the second trial—could also have testified that he was living in Mississippi at the time of the murder. In particular, Bailey testified during the first trial that when Robinson moved back to Mississippi in 2003, he initially lived with his mother for a couple of months before he moved in with Bailey.

19

informing Jarvis that 'Bo' was contained in the lineup." On the contrary, the record indicates that Jarvis identified Robinson from the lineup on February 2, 2004—two days after Jack's murder. On cross-examination during the first trial, Jarvis was asked: "When they got there, did they tell you that: We found a guy named Bo and we want you to look at these and see if you can pick them out?" Jarvis answered: "Yes." Jarvis, however, who had originally testified that no one pressured him to make an identification, clarified on redirect that Investigator Wendel did not him tell that he had "put somebody named Bo in these photos" when he showed him the photo array with Robinson's photo.[6]

Admittedly, affirmative proof of particularized prejudice is not essential to every speedy trial claim, because "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2693. However, any "presumption of prejudice" is extenuated by the defendant's acquiescence in the delay. *See id.* at 658, 112 S. Ct. at 2694. Here, the record reflects that Robinson not only acquiesced to the delay by repeatedly agreeing to reset his case, but that he also attempted to thwart apprehension by returning to Mississippi after the

---

[6]     Although Robinson contends that law enforcement used "highly suggestive techniques" to obtain Jarvis's identification, he does not raise this point as a separate issue, nor does he contend that the trial court erred in admitting Jarvis' identification of Robinson.

murder and using aliases and false identifying information, and engaging in other evasive behavior.

### 3. Conclusion

Weighing all of the factors together, we hold that Robinson failed to establish a violation of the right to a speedy trial that was grave enough to warrant a dismissal of his case.

We overrule Robinson's first issue.

## Admission of Prior Testimony of "Unavailable" Witness

In his second issue, Robinson contends that the trial court abused its discretion by denying his request to declare Tracy Bailey "unavailable" under Rule of Evidence 804(a)(5) for purposes of his second trial and admit her testimony from his first trial. The State contends that Robinson did not meet his burden to establish that Bailey was "unavailable" because he did not demonstrate that he made a good-faith effort before his second trial to locate Bailey, and therefore, the trial court did not abuse its discretion by refusing to admit Bailey's prior testimony.

## A. Standard of Review and Applicable Law

Rule 804(b)(1) allows the admission of former testimony if a declarant is unavailable as a witness. TEX. R. EVID. 804(b)(1) (providing that "[i]n criminal cases, testimony given as a witness at another hearing of the same or a different

21

proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" is not excluded as hearsay). A declarant is "unavailable" for purposes of the rule if he or she "is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance or testimony by process or other reasonable means." TEX. R. EVID. 804(a)(5). In order to establish that a declarant is unavailable under Rule 804(a)(5), the proponent of the testimony must demonstrate that a good-faith effort was made before trial to locate and present the declarant. *Reed v. State*, 312 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *Urbano v. State*, 808 S.W.2d 519, 521 (Tex. App.—Houston [14th Dist.] 1991, no pet.). However, a proponent is not required by these rules to perform all improbable efforts to produce the declarant. *See Urbano*, 808 S.W.2d. at 522; *see also Ledbetter v. State*, 49 S.W.3d 588, 594 (Tex. App.—Amarillo 2001, pet. ref'd) (stating proponent "is not required to engage in clearly futile activities before a trial court can, in its discretion, determine that the [proponent] made good-faith efforts to produce a witness at trial."). The State does not dispute that the evidence meets the other requirements of Rule 804(b)(1); the State only challenges whether Bailey qualified as unavailable for purposes of the rule.

22

We review a trial court's ruling concerning the sufficiency of the proponent's efforts to locate and present a witness for an abuse of discretion. *See Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994) (en banc); *Reed*, 312 S.W.3d at 685. We do not conduct a de novo review, but instead limit our role to determining whether the record supports the trial court's ruling. *Coffin*, 885 S.W.2d at 149. A trial court's exclusion of testimony is an abuse of discretion only if the decision lies outside the zone of reasonable disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (en banc).

## B.    Analysis

Here, the record reflects that Robinson's counsel attempted to secure Bailey's testimony through the same means he employed the first time—asking Robinson's aunt and his mother in Mississippi to bring Bailey with them to trial in Houston. Bailey, however, had left Mississippi after the first trial and neither Robinson's aunt nor his mother knew how to reach her when counsel reached out to them one month before the second trial. Robinson's aunt had heard from Bailey's cousins that Bailey had moved to Washington State, but she did not have an address or any contact information for Bailey in Washington.[7] This was the full extent of Robinson's efforts to locate and bring Bailey to testify at the second trial.

---

[7]    Although Robinson's counsel requested a court-appointed investigator to assist him with preparing for the first trial, he did not do so prior to the second trial.

There is no evidence in the record that Robinson's counsel made any attempt to contact Bailey's relatives in order to obtain information regarding her whereabouts.

Robinson argues that the present case presents a similar factual scenario to *Reed* in that the contacts defense counsel had with Bailey through Robinson's family had been exhausted and the only information they had indicated that Bailey was possibly living somewhere in Washington State. *Reed*, however, is factually distinguishable. *See Reed*, 312 S.W.3d at 683–84. In *Reed*, the State's investigator personally served the witness with process, she appeared at the courthouse, and the judge personally instructed her to show up at the rescheduled trial date. *Id.* The investigator also tried contacting the witness through friends and relatives, called cell phone numbers that constantly changed, searched for any property or registered vehicles, and directed authorities in Fort Bend County (where the witness had an outstanding warrant) to contact him if the witness was arrested. *Id.* The Court held that the State had established the unavailability of the witness by demonstrating good-faith efforts to locate and present her for trial. *Id.* Thus, unlike the present case in which counsel only attempted to locate Bailey through Robinson's family, in *Reed*, the State attempted to locate the witness through multiple means. *See id.*

Indeed, the facts of this case do not fit squarely within the parameters of *any* of the cases cited by the parties. For example, in *Reyes v. State*, the El Paso Court

24

of Appeals held that the State failed to demonstrate that it had made a good-faith pre-trial effort to locate a witness based on the State's investigator's testimony that he issued a subpoena for the witness, and, after he learned that the witness might be in Mexico, he asked the witness's grandmother for assistance in locating him. *Reyes v. State*, 845 S.W.2d 328, 330 (Tex. App.—El Paso 1992, no pet.). Although Robinson's counsel initiated his search for Bailey at least a month before the second trial, the State's investigator in *Reyes* began his search a mere *three days* before trial—a notable fact that did not escape the appellate court's attention. *Id.* at 331 ("We cannot consider this to be due diligence or reasonable good-faith under the facts here."). *Loun v. State*, *Urbano*, and *Otero–Miranda v. State* have even less in common with the current case. *See Loun v. State*, 273 S.W.3d 406, 420 (Tex. App.—Texarkana 2008, no pet.) (holding State's decision not to subpoena out-of-state witness was insufficient to establish witness's unavailability); *Urbano*, 808 S.W.2d. at 522 (holding State's search of driver's license, vehicle registration, and phone and power company records, and questioning of witness' last known employer and apartment manager and other residents at witness' last known address constituted good-faith efforts to obtain witness); *Otero–Miranda v. State*, 746 S.W.2d 352, 355 (Tex. App.—Amarillo 1988, pet. ref'd, untimely filed) (holding issuance of unserved subpoenas, without any further action, did not establish good-faith efforts to obtain witness).

25

Based on the specific facts of this case and the lack of any controlling case law, we believe that reasonable minds can disagree as to whether Robinson's trial counsel demonstrated a good-faith effort to secure Bailey's attendance at the second trial. Because the trial court's decision to exclude the testimony on this basis falls within a "zone of reasonable disagreement," we cannot say that the trial court abused its discretion by denying Robinson's request to declare Bailey "unavailable" under Rule 804(a)(5) and admit her prior testimony.

We overrule Robinson's second issue.

## Conclusion

We affirm the trial court's judgment.


Jim Sharp
Justice


Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).